**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**TWO HANDS IP LLC,**

                    **Plaintiff,**

          **- against -**                              **21-cv-3855 (JGK)**

**TWO HANDS AMERICA, INC. AND ABC**
**CORPS. 1-100,**
                                                    **OPINION AND ORDER**

                    **Defendants.**

————————————————————————


**JOHN G. KOELTL, District Judge:**

    This is a case about two food establishments. One is a
fast-food franchise that specializes in Korean corn dogs. The
other is a series of sit-down restaurants that serve a more
varied menu. But both use the term "Two Hands." The central
issue in this case is whether the use of that mark is likely to
cause consumer confusion under all the circumstances.

    The plaintiff, Two Hands IP LLC, brought this action
against the defendants, Two Hands America, Inc. and ABC Corps.
1-100 (collectively, "Two Hands Corn Dog"), for trademark and
service mark infringement under the Lanham Act, 15 U.S.C. §
1114; unfair competition under the Lanham Act, 15 U.S.C. §
1125(a); common law trademark and service mark infringement
under New York State law; and unfair competition under New York
State law.

The plaintiff moves for a preliminary injunction pursuant
to Rule 65 of the Federal Rules of Civil Procedure. The
plaintiff seeks, among other things, an order enjoining the
defendants from using the trademark and service mark "TWO HANDS"
and similar variations of that mark. For the reasons explained
below, the plaintiff's motion for a preliminary injunction is
**denied.**

**I.**

The following facts constitute the Court's findings of fact
and are undisputed unless otherwise noted.

The plaintiff, Two Hands IP LLC, is a holding company for
the intellectual property rights relating to Two Hands Group,
the owner and operator of a group of sit-down restaurants,
cafés, and coffee shops in New York and Texas with the name "Two
Hands." ECF No. 17-1, at 2. Two Hands locations are "community-
focused cafés that strive to create nutritious, simple, and
delicious food paired with exceptional coffee as well as other
non-alcoholic beverages and, at some locations, alcoholic
beverages." Id. at 3. The first Two Hands location opened in
June 2014 on Mott Street in New York City, and its success led
to the opening of additional locations in New York City, as well
as in Austin, Texas. Id.  After opening the first Two Hands

café, the plaintiff claims to have consistently used the word mark "TWO HANDS." <u>Id.</u> at 4.

In addition to its word mark, the plaintiff is the owner of the following related design mark registered with the United States Patent and Trademark Office ("USPTO"):



<u>Id.</u> The mark consists of a black circle with the literal element "TWO HANDS" written in a stylized form in white font. The USPTO issued the registration on March 21, 2017 with the registration number 5,164,155. <u>Id.</u> The registration covers coffee-related goods in Class 30, and restaurant-related services in Class 43. <u>Id.</u> at 4-5. The plaintiff claims that both its word and design marks have "acquired considerable consumer recognition and goodwill, and have become important source indicators that identify the quality goods and services provided by [Two Hands Group]." <u>Id.</u> at 5.

In July 2019, the defendants began operating fast-food restaurants specializing in Korean corn dogs by the name of "Two Hands Seoul Fresh Corn Dog," "Two Hands Corn Dog," or "Two Hands." <u>See</u> ECF No. 19, at 2; ECF No. 17-26. Upon opening their

first location in California, the defendants began using the
following design mark:



ECF No. 19, at 2. The mark consists of the literal elements "TWO
HANDS" in large orange font; "SEOUL" and "FRESH CORN DOGS" in
smaller black font; and two large smiling corn dog characters
featuring an orange sauce spread. The defendants filed an
application to register the design mark with the USPTO on August
30, 2019, but its application was not granted until March 23,
2021. ECF No. 5 ¶¶ 18–19. The USPTO originally refused the
registration in Class 43 given the existence of the plaintiff's
registration in that class, finding that there was a likelihood
of confusion between the two marks. ECF No. 17-1, at 6. But the
USPTO eventually issued the registration with the number
6,302,169 in Class 29, which covers food goods, for corn dogs.
Id. at 5.

   Meanwhile, Two Hands Corn Dog opened several locations in
the United States, including in New York and Texas. ECF No. 19,
at 2. After the defendants began operating in New York City on
or around April 2, 2021, the plaintiff claims that there have
been "numerous instances of actual confusion" between the

defendants' Two Hands Corn Dog establishments and the plaintiff's Two Hands cafés. In particular, the plaintiff notes the following: multiple customers coming to the plaintiff's locations "looking for corn dogs"; a customer submitting an inquiry via the plaintiff's website "asking if they offer vegetarian corn dog options"; the defendants' customers mistakenly posting reviews of the defendants' establishments linked to the plaintiff's locations; and customers mistakenly tagging the plaintiff's locations on social media when posting images or videos of the defendants' establishments. ECF No. 17-1, at 7. Accordingly, on April 2, 2021, the plaintiff sent a letter to the defendants demanding that they "immediately cease and desist the continuation of the unauthorized use of the TWO HANDS Trademark in connection with restaurant services." ECF No. 17-43. The defendants did not reply.

The plaintiff initiated this action on May 3, 2021. ECF No. 5. On June 10, 2021, the defendants opened their second location in New York City on the same street as the plaintiff's original café on Mott Street. ECF No. 17-1, at 6-7. The plaintiff claims that the opening of this location has "escalated the gravity" of the defendants' alleged infringement. Id. at 7. As such, the plaintiff brought this motion for a preliminary injunction on July 26, 2021. ECF No. 17.

**II.**

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," <u>Grand River Enter. Six Nations, Ltd. v. Pryor</u>, 481 F.3d 60, 66 (2d Cir. 2007), and it "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997).[1] "A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." <u>N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.</u>, 883 F.3d 32, 37 (2d Cir. 2018). A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." <u>Faiveley Transp. Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 118 (2d Cir. 2009).[2]

---

[1] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

[2] In the Second Circuit, when seeking an injunction that is "mandatory" (that is, one that changes the status quo), the moving party is held to a heightened standard, requiring a demonstration of a "clear" or "substantial" likelihood of success on the merits and a "strong showing" of irreparable harm. <u>See</u> <u>New York ex rel. Schneiderman v. Actavis PLC</u>, 787 F.3d 638, 650 (2d Cir. 2015). Here, the plaintiff seeks to halt the alleged infringement of its marks. Such an injunction is generally considered to be prohibitory, rather than mandatory. <u>See, e.g.</u>, <u>Louis Vuitton Malletier v. Dooney & Bourke, Inc.</u>, 454 F.3d 108, 114 (2d Cir. 2006). It is unnecessary to decide whether the heightened standard applies here, however, because the plaintiff has failed to satisfy even the lower standard that applies to prohibitory injunctions.

The Lanham Act prohibits any person "without the consent of
the registrant" from using any "reproduction, counterfeit, copy,
or colorable imitation of a registered mark in connection with
the sale, offering for sale, distribution, or advertising of any
goods or service on or in connection with which such use is
likely to cause confusion, or to cause mistake, or to deceive."
15 U.S.C. § 1114(1)(a). "The Act similarly prohibits the
infringement of unregistered, common law trademarks." Time, Inc.
v. Petersen Publ'g. Co., 173 F.3d 113, 117 (2d Cir. 1999)
(citing 15 U.S.C. § 1125(a)(1)).[3]

To prevail on a trademark infringement or unfair
competition claim under this provision, a plaintiff must show
(1) that it has a valid mark that is entitled to protection and
(2) that the defendant's actions are likely to cause consumer
confusion in the marketplace. The Morningside Grp. Ltd. v.
Morningside Capital Grp., LLC, 182 F.3d 133, 137 (2d Cir. 1999).
Once the possessor establishes a valid mark entitled to
protection, the plaintiff must then prove the "key element" of a
trademark infringement suit, which is "that there is a
likelihood of confusion or, in other words, that numerous
ordinary prudent purchasers are likely to be misled or confused

_____

[3] Because courts use substantially the same standard for trademark and service
mark violations, the Court considers them together. See Murphy v. Provident
Mut. Life Ins. Co. of Pa., 923 F.2d 923, 927 (2d Cir. 1990).

as to the source of the product in question because of the entrance in the marketplace of defendant's mark." Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993); see also VIDIVIXI, LLC v. Grattan, 155 F. Supp. 3d 476, 480 (S.D.N.Y. 2016).

A plaintiff may allege either forward or reverse confusion. Forward confusion occurs where the junior user uses the mark to sell goods or services "based on the misperception that they originate with the senior user." Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 740 (2d Cir. 1994). "Reverse confusion exists when a subsequent user selects a trademark that is likely to cause consumers to believe, erroneously, that the goods marketed by the prior user are produced by the subsequent user." Lang v. Ret. Living Publ'g Co., 949 F.2d 576, 583 (2d Cir. 1991). Reverse confusion "recognizes the danger that a junior user's products may tarnish the image of the senior user's products, or that consumers may view the senior user as an unauthorized infringer of the junior user's products, thus injuring the senior user's reputation and impairing its good will." Becoming, Inc. v. Avon Products, Inc., No. 01-cv-5863, 2001 WL 930794, at *9 (S.D.N.Y. Aug. 15, 2001); see also Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 293 (S.D.N.Y. 2003).

In <u>Polaroid Corp. v. Polarad Electronics Corp.</u>, 287 F.2d 492 (2d Cir. 1961), Judge Friendly listed eight non-exclusive factors that courts should consider in order to determine whether there is a likelihood of confusion between different marks. These factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

<u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 115 (2d Cir. 2009). No single factor is dispositive. <u>Arrow Fastener Co. v. Stanley Works</u>, 59 F.3d 384, 400 (2d Cir. 1995).

## III.

The plaintiff has failed to show that it is entitled to the "extraordinary and drastic remedy" of a preliminary injunction. See <u>Moore v. Consol. Edison Co. of N.Y.</u>, 409 F.3d 506, 510 (2d Cir. 2005).

### A. Irreparable Harm

For a motion for a preliminary injunction to be granted, the plaintiff must establish that, absent an injunction, it

would likely suffer "an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005); see also JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) ("Likelihood sets, of course, a higher standard than 'possibility.'"). Irreparable harm exists in a trademark case "when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial," because reputation is "not calculable nor precisely compensable." Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir. 1985). However, a plaintiff's unreasonable delay in bringing the motion may "preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964, 968 (2d Cir. 1995).

Following the enactment of the Trademark Modernization Act of 2020, a plaintiff seeking a preliminary injunction is entitled to a rebuttable presumption of irreparable harm upon a court's finding a likelihood of success on the merits. 15 U.S.C. § 1116(a). Thus, if (1) the plaintiff establishes that it has a

likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm.

The presumption does not arise in this case, however, because, as explained below, the plaintiff has failed to demonstrate a likelihood of confusion. This alone precludes the application of the Trademark Modernization Act's presumption. See Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC, No. 21-cv-149, 2021 WL 1372658, at *12 (S.D.N.Y. Apr. 12, 2021).

The plaintiff has failed otherwise to demonstrate a likelihood of irreparable harm. First, the significant delay in bringing the preliminary injunction motion counsels against a finding of irreparable injury. The plaintiff was aware of the defendants' alleged infringement by at least April 2, 2021, when it sent its cease-and-desist letter. ECF No. 5 ¶ 26; ECF No. 17-43. However, it did not move for a preliminary injunction until July 26, 2021—more than three months later. ECF No. 17. Courts in this circuit have denied preliminary injunctions for delays shorter than this one. See, e.g., Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the

issuance of a preliminary injunction."); Citibank, N.A. v.
Citytrust, 756 F.2d 273, 276-77 (2d Cir. 1985) (finding that a
ten-week delay rebutted a claim of irreparable injury).

Nor has the plaintiff offered any persuasive justification
for its delay, such as "ignorance regarding defendant[s']
alleged infringement, good-faith attempts to investigate that
infringement, and diligent pursuit of settlement negotiations."
Cf. Goat Fashion Ltd. v. 1661, Inc., No. 19-cv-11045, 2020 WL
5758917, at *5-6 (S.D.N.Y. Sept. 28, 2020). The plaintiff argues
that its attempts to settle with the defendants provide such
justification. ECF No. 23, at 7. But the plaintiff had no reason
to believe the defendants would settle, having been rebuffed at
every opportunity. Cf. Fashion Wk., Inc. v. Council of Fashion
Designers of Am., Inc., No. 16-cv-5079, 2016 WL 4367990, at *4
(S.D.N.Y. Aug. 12, 2016) (stating that the parties' alleged
attempts to settle could not justify the plaintiff's delay
because the plaintiff "ha[d] not adduced any evidence" to
justify its belief that the defendants would in fact settle).
Attempts to settle can provide a buffer only when there is a
prospect of resolution, and there has been no such showing here.

The plaintiff's other attempts to excuse its delay are
similarly unavailing. In particular, the plaintiff argues that
the defendants' opening of their Mott Street location increased

the "frequency of instances of actual confusion," and that this
ought to excuse its delay. ECF No. 23, at 6-7. But the length of
delay is measured from the time the plaintiff originally learned
of the alleged violation or is put on notice thereof, Tough
Traveler, 60 F.3d at 968, not when the irreparable injury
allegedly begins. In this case, it is undisputed that the
plaintiff learned of the defendants' alleged use of its marks in
April 2021 at the latest. The plaintiff's decision to wait until
July 2021 to bring this motion "suggests that there is, in fact,
no irreparable injury." See Citibank, 756 F.2d at 277.

Moreover, the plaintiff has failed to show that it would be
irreparably harmed because it has not adequately alleged that it
will lose control over its reputation, nor provided sufficient
evidence showing a possible loss of goodwill in the industry.
The plaintiff must do more than "assert that confusion itself
will irreparably injure them," U.S. Polo Ass'n, 800 F. Supp. 2d
at 540, and "conclusory statements of loss of reputation and
goodwill constitute an insufficient basis for a finding of
irreparable harm." Singas Famous Pizza Brands Corp. v. N.Y.
Advert. LLC, No. 10-cv-8976, 2011 WL 497978, at *6 (S.D.N.Y.
Feb. 10, 2011), aff'd, 468 F. App'x 43 (2d Cir. 2012); see also
Algood Casters Ltd. v. Caster Concepts, Inc., No. 20-cv-4623,
2020 WL 5274172, at *4 (S.D.N.Y. Sept. 4, 2020) (noting that the
conclusory statements of the movant's president are insufficient

to establish irreparable harm). A few instances of consumer
confusion that is dispelled upon further inquiry "is not
equivalent to evidence of irreparable harm." Engine Cap, 2021 WL
1372658, at *12. This is particularly true where, as here, there
is no evidence of "detrimental effects from the purported
confusion." Id. The plaintiff concedes that there is no evidence
that the defendants' services or goods are of inferior quality,
and there is no evidence to suggest that the few instances of
consumer confusion have caused consumers to alter their
purchasing decisions. Cf. id. Moreover, the plaintiff's fears of
bad restaurant reviews as a result of consumer confusion are
merely speculative; they cannot support a finding of irreparable
injury. Without any such evidence, the plaintiff cannot
substantiate its assertions that the defendants' alleged
infringement undermines-or results in a loss of control over-its
reputation and goodwill.

Given that the Trademark Modernization Act's presumption is
inapplicable here, and the plaintiff has not otherwise supported
its claimed loss of goodwill or damage to its reputation, the
plaintiff has failed to demonstrate irreparable harm.

### B. Merits

The plaintiff's motion for a preliminary injunction must
also be denied because the plaintiff has failed to show that it

has a likelihood of success on the merits. Because courts use substantially the same standard for claims for trademark infringement under the Lanham Act, unfair competition under the Lanham Act, trademark infringement under New York State law, and unfair competition under New York State law, these claims are considered together. See, e.g., Disney Enters., Inc. v. Sarelli, 322 F. Supp. 3d 413, 430 (S.D.N.Y. 2018).

### 1. Protectability of the Marks

The plaintiff claims that the defendants have violated both its design and word marks relating to "TWO HANDS." As a threshold matter, both are valid trademarks entitled to protection.

The plaintiff's design mark is plainly protected because it is registered with the USPTO. Under the Lanham Act, registration of a trademark constitutes "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration . . . ." 15 U.S.C. § 1115(a). The defendants have not provided any evidence to rebut this presumption. Accordingly, the plaintiff's design mark is valid and entitled to protection.

15

The plaintiff's word mark is also entitled to protection. The strength of a trademark in the marketplace and the degree of protection to which it is entitled are analyzed under four categories of marks that indicate increasing distinctiveness and protectability: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. See Estee Lauder Inc. v. Gap, Inc., 108 F.3d 1503, 1508-09 (2d Cir. 1997). "A generic term is a common name, like automobile or aspirin, that describes a kind of product." Gruner, 991 F.2d at 1075. Generic marks are not protectable. Id. A descriptive mark is "one that tells something about a product, its qualities, ingredients or characteristics." Id. at 1076. Descriptive terms are protectable only with evidence of secondary meaning. Id. A suggestive mark suggests the product, though it may take imagination to grasp its nature. Id. An arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product, and a fanciful mark is a made-up name. See id. at 1075-76. Suggestive, arbitrary, and fanciful marks are eligible for protection without proof of secondary meaning. See id.; see also Gameologist Grp., LLC v. Sci. Games Int'l, Inc., 838 F. Supp. 2d 141, 154 (S.D.N.Y. 2011), aff'd, 508 F. App'x 31 (2d Cir. 2013).

The mark "TWO HANDS" is suggestive and thus valid. Contrary to the defendants' assertion, the mark is not descriptive, because it "does not directly describe[] the goods with which it

16

is associated" nor "forthwith convey[] an immediate idea of the ingredients, qualities or characteristics of the goods [or services at issue]." Kohler Co. v. Bold Int'l FZCO, 422 F. Supp. 3d 681, 719 (E.D.N.Y. 2018). Nor, contrary to the plaintiff's assertion, is the mark arbitrary or fanciful. "TWO HANDS" is not a "randomly chosen mark." Cf. Giggle, Inc. v. netFocal, Inc., 856 F. Supp. 2d 625, 630 (S.D.N.Y. 2012). There are several other uses of the term in connection with food goods and services—including "Two Hands Burger," "Two Hand Burger," "Two Hands Crepe & Juice Bar," and "Two Hands Wines," ECF No. 19, at 4-6—buttressing the conclusion that the mark was not "invented solely for use as a trademark or a common word applied in an unfamiliar way, so as to fit into the fanciful or arbitrary category." See Pan Am. World Airways, Inc. v. Panamerican Sch. of Travel, Inc., 648 F. Supp. 1026, 1033 (S.D.N.Y.), aff'd sub nom. Pan Amer v. Pan Amer Sch., 810 F.2d 1160 (2d Cir. 1986). Instead, there is "certainly a connotation" to the term "TWO HANDS" that evokes images of restaurants and eating food, Giggle, 856 F. Supp. 2d at 630, though the mark requires "some degree of imagination, perhaps assisted by consideration of the product itself," for consumers to "invest" the mark with its "intended mental association." Sunenblick v. Harrell, 895 F. Supp. 616, 625 (S.D.N.Y. 1995), aff'd, 101 F.3d 684 (2d Cir. 1996). As the defendants highlight, the term "two hands" is

sometimes used to refer to large food items that require "two hands" to hold and eat. ECF No. 19, at 6. Given all this, the word mark "TWO HANDS" is suggestive. It is therefore eligible for protection without proof of secondary meaning.

Accordingly, both marks are entitled to protection under the Lanham Act.

## 2. Likelihood of Confusion

In order to demonstrate a likelihood of success on the merits, the plaintiff must also demonstrate that there is a likelihood of confusion between its mark and the defendants' mark. A review of the Polaroid factors belies the plaintiff's claim that such a likelihood of confusion exists.  As to the word mark, only the similarity factor weighs in the plaintiff's favor; as to the design mark, none of the Polaroid factors weigh in the plaintiff's favor.

Other than the second factor, similarity of the marks, the analysis of the Polaroid factors is the same for both of the plaintiff's marks, and they can be analyzed together.

## a. Strength of the Mark

The first factor is neutral for the plaintiff. The "strength" of a mark is a measure of "its tendency to identify the goods [or services] sold under the mark as emanating from a

particular, although possibly anonymous, source." Sports Auth.,
Inc. v. Prime Hosp. Corp., 89 F.3d 955, 960-61 (2d Cir. 1996).
In gauging a mark's strength, a court must consider both the
inherent distinctiveness of the mark and the mark's
distinctiveness in the marketplace. See Time, 173 F.3d at 118.
Suggestive marks, such as the one here, are inherently
distinctive. See Star Indus., Inc. v. Bacardi & Co., 412 F.3d
373, 385 (2d Cir. 2005). However, suggestive marks are not
necessarily distinct in the marketplace. See Gameologist, 838 F.
Supp. 2d at 158 ("Although a suggestive mark is entitled to
protection without a showing of secondary meaning,
suggestiveness is not necessarily dispositive of the issue of
the strength of the mark without a showing of secondary
meaning."). The burden is on the plaintiff to prove such market
distinctiveness with reference to this circuit's well-
established secondary meaning factors: (1) advertising and
promotional expenses; (2) consumer studies linking the mark to
the source; (3) unsolicited media coverage of the product; (4)
sales success; (5) attempts to plagiarize the mark; and (6)
length and exclusivity of the mark's use. Centaur Commc'ns, Ltd.
v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1222 (2d Cir. 1987).

        In this case, the secondary meaning factors weigh against
the plaintiff. The plaintiff has not provided any evidence as to
the actual costs of its promotional efforts, thus weighing

against a finding of distinctiveness. See Gameologist, 838 F. Supp. 2d at 158. It has also failed to provide any consumer studies linking "TWO HANDS" to its business or any evidence of attempts to plagiarize its mark.

Most notably, the plaintiff has not used the mark for a sufficiently long time, and its use has not been sufficiently exclusive. The plaintiff has only been using "TWO HANDS" since 2014, which courts in this circuit have deemed insufficient. See, e.g., Medici Classics Prods., LLC v. Medici Grp., LLC, 683 F. Supp. 2d 304, 310 (S.D.N.Y. 2010); Gameologist, 838 F. Supp. 2d at 160. The defendants have also adduced evidence of several other commercial uses of the term "TWO HANDS" or "TWO HAND" in the restaurant and bar industry, including in New York City, which "weighs against a finding that [the plaintiff's mark] is strong." See Lang, 949 F.2d at 581; Air Cargo News, Inc. v. Tabmag Publ'g, Ltd., No. 07-cv-480, 2007 WL 1101183, at *10 (E.D.N.Y. Apr. 11, 2007) (finding no exclusivity where at least five other publications used the phrase "air cargo" in their title). Even assuming the media coverage factor weighs in the plaintiff's favor given their "substantial coverage in the press," ECF No. 17-1, at 13, as well as the plaintiff's success, on balance, the plaintiff has not shown distinctiveness in the marketplace. The "strength" factor is, thus, at best neutral for the plaintiff. See Gameologist, 838 F. Supp. 2d at 157-60

(weighing the weakness in demonstrating acquired distinctiveness against the plaintiff and concluding that, despite a relatively strong showing on inherent distinctiveness because of the mark's suggestiveness, this <u>Polaroid</u> factor was "at best neutral" for the plaintiff).[4]

### b. Similarity of the Marks — Word Mark

As to the word mark specifically, the second factor weighs in the plaintiff's favor. This factor considers the degree of similarity between the marks. When analyzing this factor, a court should address "two key questions: (1) whether the similarity between the two marks is likely to cause confusion and (2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, [a court does] not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." <u>Sports Auth.</u>, 89 F.3d at 962.

---

[4] Some cases suggest that, where the plaintiff alleges reverse confusion, as here, it is appropriate to consider the strength of the junior user's mark, because the essence of such a claim is that the junior user overpowers the senior user's mark. <u>See</u> <u>Gameologist</u>, 838 F. Supp. 2d at 160 n.8. Here, the parties do not raise this issue and do not discuss whether the defendants' mark is a strong one. There is no evidence, however, that the defendants' mark is any stronger than the plaintiff's: it is similarly suggestive, the defendants' use is similarly non-exclusive and insufficiently lengthy, and the defendants also fail to provide evidence of promotional expenses, consumer studies, and attempts to plagiarize the mark. Therefore, even if the Court were to consider the strength of the defendants' mark, this factor would still be neutral as to a likelihood of confusion.

Both parties use the mark "TWO HANDS," and it is the dominant element in each party's mark. "[W]hen the dominant words in two marks are the same, courts have found that their similarity can cause consumer confusion." Lebewohl v. Heart Attack Grill LLC, 890 F. Supp. 2d 278, 294 (S.D.N.Y. 2012). The United States Court of Appeals for the Second Circuit has also noted that "[i]t is extremely unusual for the mark of a junior user to include two identical words of a senior user's mark in sequence." Car-Freshner Corp. v. Am. Covers, LLC, 980 F.3d 314, 330 (2d Cir. 2020).

It is true that the word mark "TWO HANDS" is most often used by the defendants in connection with their design mark and therefore appears in a font different from the plaintiff's font, accompanied by the words "Seoul" or "Fresh Corn Dogs," and either printed in or surrounded by a bright orange hue, and this diminishes the similarity of the marks. However, the "TWO HANDS" mark is not always accompanied by these differentiating features. Moreover, "[a]ny visual differences between plaintiff['s] and defendant[s'] marks becomes nonexistent when the marks are spoken." See Toys "R" Us Inc. v. Abir, No. 97-cv-8673, 1997 WL 857229, at *5 (S.D.N.Y. Dec. 19, 1997). Accordingly, these differences are not dispositive when considering the word mark "TWO HANDS" as opposed to the design mark in which the word mark appears.

On the whole, considering the identical nature of the word marks, the similarity factor weighs in favor of the plaintiff with respect to its word mark.

### c. Similarity of the Marks – Design Mark

However, the similarity of the marks factor weighs against the plaintiff with respect to its design mark.

The plaintiff's design mark is comprised of a black circle with "TWO HANDS" written in a stylized white script in lower case typeface. By comparison, the defendants' mark is comprised of two large smiling corn dog characters with orange sauce spread over them; the literal elements "TWO HANDS" in a bright orange italicized font; and, in smaller font both above and below the "TWO HANDS" elements, the words "SEOUL" and "FRESH CORN DOGS" in black capitalized lettering. Visually, the design, overall shape, and word placement is very different between the two marks, which favors the defendant. Cf. Engine Cap., 2021 WL 1372658, at *6 (noting that the marks' respective "mode of presentation, typeface, inclusion of additional words, dress colors, and associated tie-ins, such as a mascot" are important factors); Wright v. New Moda, LLC, No. 17-cv-9737, 2020 WL 4288377, at *6 (S.D.N.Y. July 27, 2020). Moreover, the overall impression the marks convey is different, with the plaintiff's mark conveying a clean, more upscale image, and the defendants'

mark conveying a more casual and fun image. Because of these differences in design and impression, this factor weighs against the plaintiff—the shared use of the literal elements "TWO HANDS" notwithstanding. Cf. Gameologist, 838 F. Supp. 2d at 160-61 (finding that the similarity was low, despite both marks using term "bling" and depicting diamonds, because defendants' mark included other terms and depictions, resulting in a "different general impression" to the public); Major League Baseball Props., Inc. v. Opening Day Prods., Inc., 385 F. Supp. 2d 256, 267 (S.D.N.Y. 2005) (finding that the degree of similarity between marks was low where both products used phrase "opening day" but logos and other depictions "convey[ed] a different impression" to the public).

### d. Proximity of the Marks

The third factor—proximity of the marks—is neutral. This factor considers "to what extent the two products compete with each other," taking into account both the "market proximity and geographic proximity." Brennan's, Inc. v. Brennan's Rest., LLC, 360 F.3d 125, 134 (2d Cir. 2004). "Market proximity asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products. Both elements seek to determine whether the two products have an

overlapping client base that creates a potential for confusion."
Id.

In this case, the parties do not have close market
proximity. While they are both restaurants, they are different
types of restaurants: the plaintiff's restaurants are sit-down
venues and are more upscale as compared to the defendants' small
fast-food stores that lack seating. The food served at each
restaurant is also different, with the plaintiff serving such
items as acai bowls, house-made breakfast tacos, toasted local
sourdough toasts, grass-fed hamburgers, and smoothies, and the
defendants serving only corn dogs. The parties cater to
different desires and audiences. Cf. Brockmeyer, 248 F. Supp. 2d
at 296-97 (finding that two magazine companies were not in
proximity because, despite their being in the same general
industry, the plaintiff did not show "any congruence" between
the respective magazines' audiences). "The fact that both
parties' products exist within the same industry is not enough"
to satisfy competitive proximity." Hypnotic Hats, Ltd. v.
Wintermantel Enters., LLC, 335 F. Supp. 3d 566, 586 (S.D.N.Y.
2018). Because the plaintiff has not provided any evidence to
suggest that consumers view the restaurants as competitors, the
plaintiff has not sufficiently demonstrated market proximity.

However, the services are plainly geographically close.
Both the plaintiff and the defendants have locations in New York
City and Texas, and the defendants' "first location in New York
City is located less than 1.5 miles from all three of [the
plaintiff's] locations." ECF No. 17-1, at 16. Notably, the
defendants recently opened a store on the very same block as the
plaintiff's original location on Mott Street. The parties are
thus in geographic proximity to one another.

Given the lack of market proximity but the existence of
geographic proximity, this factor favors neither party.

### e. Bridging the Gap

The fourth factor, meanwhile, weighs against the plaintiff.
"Bridging the gap refers to the senior user's interest in
preserving avenues of expansion and entering into related
fields." Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d
497, 504 (2d Cir. 1996). This factor involves a determination of
the likelihood that the plaintiff will enter the defendants'
business or of the average customer's perception that the
plaintiff would enter the defendants' market. See Sports Auth.,
89 F.3d at 963. Even where both parties are in the same general
industry, this factor does not necessarily weigh in the
plaintiff's favor. See, e.g., Brockmeyer, 248 F. Supp. 2d at
297; SLY Mag., LLC v. Weider Publ'ns LLC, 529 F. Supp. 2d 425,

26

440 (S.D.N.Y. 2007), <u>aff'd</u>, 346 F. App'x 721 (2d Cir. 2009). The
central question is whether the plaintiff is likely to target
the defendants' consumer base. <u>See</u> <u>Cheddar Bob's Inc. v.</u>
<u>Macsnmelts Mgmt. Co.</u>, No. 16-cv-1331, 2020 WL 1323018, at *10-11
(E.D.N.Y. Jan. 14, 2020).

In this case, the plaintiff has not expressed any desire to
enter the fast-food market, let alone the corn dog-specific
fast-food market. The plaintiff has also not provided any
evidence suggesting that an average consumer would think it
would likely do so. Accordingly, this factor weighs in favor of
the defendants. <u>See</u> <u>Khan v. Addy's BBQ LLC</u>, 419 F. Supp. 3d 538,
556 (E.D.N.Y. 2019) (finding against the plaintiff because,
"[o]ther than the conclusory and self-serving statements in
plaintiff's declaration, nothing in the record suggest[ed] that
he ever had any intention of expanding his business to create a
chain of restaurants; or that the public believed he was likely
to do so").

### f. Actual Confusion

The next factor—actual confusion—also weighs against the
plaintiff. "[A]ctual confusion means consumer confusion that
enables a seller to pass off his goods as the goods of another."
<u>Sports Auth.</u>, 89 F.3d at 963. "The relevant confusion is that

which affects the purchasing and selling of the goods or services in question." Lang, 949 F.2d at 583.

In this case, the plaintiff's evidence of actual confusion consists of "potential customers" coming to their locations in search of corn dogs, customers inquiring about whether the plaintiff sells corn dogs and what types, and numerous instances of the defendants' customers mistakenly tagging the plaintiff on social media as the source of their food and submitting reviews therefor. ECF No. 17-1, at 12–13. This is evidence of reverse confusion, if any.

However, the plaintiff's evidence of customers submitting inquiries or entering their locations upon belief that they are the defendants is not "the type of confusion against which the Lanham Act was designed to protect." See SLY, 529 F. Supp. 2d at 440. The Act is meant to protect "against mistaken purchasing decisions and not against confusion generally." Id. In particular, the Act seeks to avoid "consumer confusion that enables a seller to pass off his goods as the goods of another." Lang, 949 F.2d at 582. In this case, the plaintiff has not alleged that any customers bought the defendants' food thinking it was the plaintiff's. Cf. id. at 583. "There is no reason to believe that [the] confusion represented by the [misdirected inquiries] could inflict commercial injury in the form of either

a diversion of sales, damage to goodwill, or loss of control over reputation." Id. Accordingly, the confusion alleged is insufficient.

The plaintiff's evidence of mistaken social media posts and reviews is similarly insufficient. Even assuming the mistaken posts demonstrate confusion in the general sense, "[n]o evidence links the confusion evinced by the [posts] to any potential or actual effect on customers' purchasing decisions." See SLY, 529 F. Supp. 2d at 441. This is therefore not the type of confusion that can satisfy this Polaroid factor. See id.; Sports Auth., 89 F.3d at 963 ("To show actual confusion, [the plaintiff] must demonstrate that [the defendants'] use 'could inflict commercial injury in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation.'"). Because the plaintiff has failed to show that any instances of apparent confusion resulted in commercial injury, the plaintiff has not demonstrated actual confusion under this Polaroid factor, and the factor weighs in favor of the defendants.

### g. Bad Faith

The "bad faith" factor also weighs against the plaintiff. "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by

adopting the mark with the intent to sow confusion between the two companies' products." Star*,* 412 F.3d at 388.

In this case, the plaintiff argues that the defendants must have acted in bad faith because the defendants were apparently aware of the plaintiff's mark from their initial failed attempt to register their design mark with the USPTO in Class 43. The defendants are correct, however, that awareness of the plaintiff's mark does not mean that they acted in bad faith. See, e.g., Arrow Fastener, 59 F.3d at 397–98; Friesland Brands, B.V. v. Viet. Nat'l Milk Co., 228 F. Supp. 2d 399, 410 (S.D.N.Y. 2002). Rather, the defendants may have reasonably concluded that there would be no confusion between their mark as it would be used and the plaintiff's use of its mark. There is no basis from which to infer any bad faith on the part of the defendants and, therefore, this factor favors the defendants. See Brockmeyer, 248 F. Supp. 2d at 299.

### h. Quality of the Product

Next, the "quality" factor is neutral. The analysis of the quality of the defendants' product "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." Arrow Fastener, 59 F.3d at 398.

In this case, neither party has produced any evidence on the quality of the defendants' products. While the plaintiff has expressed concerns about potential quality control issues, these are purely hypothetical concerns at this stage. Therefore, this factor is neutral. See Wright, 2020 WL 4288377, at *7.

### i. Consumer Sophistication

The final factor—consumer sophistication—is also neutral. In considering the sophistication of consumers, a court must evaluate "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1137 (2d Cir. 1979). In general, greater sophistication of consumers reduces the likelihood of confusion. Centaur, 830 F.2d at 1228. Consumers of relatively inexpensive goods that may be purchased on impulse are generally considered unsophisticated for purposes of this factor. See Sports Auth., 89 F.3d at 965.

In this case, the parties disagree as to whether the plaintiff's customers should be considered sophisticated or unsophisticated. The only evidence in the record on this point appears to be the plaintiff's menu, which features a variety of price points, which are generally more expensive than the defendants' corn dogs. Despite the inferences that can be drawn

31

from the menu's pricing, the "lack of evidence precludes any useful conclusion on this issue." Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 79 (2d Cir. 1988); Cheddar Bob's, 2020 WL 1323018, at *12 (giving factor little weight where the only evidence was the restaurant's prices). This factor is therefore neutral.

### j. Overall Likelihood of Confusion

On balance, the plaintiff has failed to demonstrate a likelihood of confusion between its marks and the defendants' marks. While the word marks appear sufficiently similar so as to weigh that Polaroid factor in favor of the plaintiff, the remaining factors are either neutral or favor the defendant. There is even less likelihood of confusion with regards to the plaintiff's design mark, which appears to be distinctly different from the defendants' design mark. At this stage in the litigation, the plaintiff has failed to establish a likelihood of success on the merits for its trademark infringement claims under the Lanham Act, 15 U.S.C. § 1114, or for its other claims.

### C. Balance of the Equities and the Public Interest

Finally, the plaintiff has failed to show a balance of the equities in its favor. In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the

Case 1:21-cv-03855-JGK   Document 26   Filed 09/29/21   Page 33 of 34

Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Id.

The balance of the equities and the public interest argue against granting a preliminary injunction in this case. The defendants would incur considerable expense in redesigning their logo and references to it and in marketing any new design and name. They would also lose whatever goodwill they have built up in their current design and name. By contrast, the plaintiff has not demonstrated that it would be irreparably harmed by the defendants' continued use of its respective marks. The equities therefore weigh in favor of the defendants.

The public interest also argues against an injunction because enjoining the defendants from using the "TWO HANDS" mark and their logo would cost them business. See, e.g., Fashion Wk., 2016 WL 4367990, at *9. While there is generally a strong interest in preventing public confusion, the plaintiff has not alleged that sufficient confusion exists. Therefore, the public interest would not be served by a preliminary injunction in this

case. See, e.g., Kind LLC v. Clif Bar & Co., No. 14-cv-770, 2014
WL 2619817, at *14 (S.D.N.Y. June 12, 2014).

**IV.**

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the arguments
are either moot or without merit. The plaintiff's motion for a
preliminary injunction is **denied**.

**SO ORDERED.**

**Dated:      New York, New York**
**            September 28, 2021**

_____
        **John G. Koeltl**
**United States District Judge**